FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT - 8 2014

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

Jason Joseph Clark,
**Tamah Jada Clark** (both on their own
behalf and that of "Baby" Clark),

    Plaintiffs

v.

DANIEL J. PORTER, et al.,

    Defendants

)
)
)
)
)
)
)
)
)
)
)

1:14-cv-02128-WBH

**Civil Action No.**_____

## EMERGENCY NOTICE TO THE COURT

IN THE INTEREST OF JUSTICE AND THE LAWFUL PRESERVATION OF
THE DIGNITY OF THE U.S. CONSTITUTION—(REGARDING MOTIONS
AND BRIEFS/MEMORANDUMS OF DEFENDANTS REPRESENTED BY
RALEIGH W. ROLLINS AND DEBORAH NOLAN GORE)—; AND
INTEGRATED MOTION TO DENY THE AFOREMENTIONED MOTIONS
WITH INTEGRATED MEMORANDUM IN SUPPORT THEREOF; AS WELL
AS INTEGRATED MOTION FOR INJUNCTIVE RELIEF AND
MEMORANDUM IN SUPPORT THEREOF

*Plaintiffs' Original Complaint [Amended July 15, 2014] and 'Exhibit A' attached*

*thereto have already spelled out—in more than ample detail with* **insurmountable**

*evidence and irrefutable proof— that the United States Constitution has been*

*violated, beyond a shadow of doubt. (See exhibit a). For this Court to allow ANY of*

*the Defendants in the present action (including those not specified above), as second-class "citizens of the United States" lacking **unalienable** **human rights** under the U.S. Constitution, to continue presenting arguments in contradiction of said Constitution, citing inapplicable case "law" NOT reflective of Plaintiffs' domicile WITHOUT the United States (under the Organic U.S. Constitution—as non "citizens of the United States")to [unsuccessfully] support their claims; is seditious, treacherous, treasonous, and cowardly. There is no argument that the above-Defendants or their co-defendants (all "citizens of the United States") could present to thwart Plaintiffs' claims under the Constitution; there is absolutely NONE. Furthermore, using their own DOMESTIC United States (State and/or Federal) case "law" INVALIDATES every claim they attempt to substantiate thereby, period. For said Defendants to continue challenging the authority of the Constitution (and citing State/Federal statues and inapplicable case law to do so) is asinine. From the perspective of the Plaintiffs, it can be likened to witnessing a three-legged, mentally-challenged canine attempt to run through a titanium wall because it does not understand the impossible nature of the feat before it. Similarly, the Defendants (ALL defendants who have appeared in the present action) have arrived at the first major league game of their lifetimes, prepared with little league knowledge—and do not stand a chance at this level of the game;*

*no amount of time in law school could prepare them for the legal concepts that have been so eloquently presented by Plaintiffs in the present action, as has been demonstrated by their painfully pathetic attempts at making valid arguments— rather than recognize their defeat early on. Even with the unscrupulous, unethical, and unlawful interference of various U.S. Judges (B. Avant Edenfield, Magistrate Linda T. Walker, and Willis B. Hunt Jr.) who have worked so hard to give them an unfair advantage, the aforementioned STILL have no chance. For goodness sake, the attorneys for the Defendants are officers of the Court (per Local Rule 83.1(A)(2)(b)), along with the presiding Judge—thus, there is a **__MAJOR__** conflict of interest here, which explains why there is no Justice in U.S. Courts.*

*At this point, Plaintiffs' patience has worn thin. If the Court wants to continue to play games and conduct this Court as a three-ring circus in a manner that makes a mockery of the U.S. Constitution and other Organic Laws of the U.S., then so be it; but, Plaintiffs will not dignify such behavior nor will We, the Plaintiffs, participate. The very simple fact of the matter is, the United States Federal and State Governments have been silently overthrown by international bankers and law experts who thoroughly understand that governments run off of law and currency.(See 'Exhibit A' of the Original Complaint [Amended July 15, 2014]).*

*Therefore, whoever controls the law and the currency; control the entire government and the people who are willfully submitting themselves to said government whether knowingly or unknowingly. What the aforementioned unnamed legal experts and international bankers have done is trick Americans into accepting the diminished legal status of "citizen of the United States"; thereby FORFEITING their would-be inherent sovereignty in this land (United States land mass), making it available to the United States Federal Government for the taking—which is what has happened; the U.S. Federal Government has usurped the birthright of millions of Americans. (See 'Exhibit A' of the Original Complaint [Amended July 15, 2014]).*

*Thus, the legal experts and international bankers—who have subverted American Liberty, Freedom, and Justice by infiltrating the U.S. Government—have come up with the ingenious plan of burying the truth of what has happened deep, deep down within U.S. history and law books in a way that not even the most acute of attorneys could decipher the nature and proportion of the FRAUD that has been perpetrated upon MILLIONS of unsuspecting Americans. Meanwhile, the United States Federal Government parades around committing the most heinous atrocities in the name of the good people of America, making the rest of the world think that*

we are ALL heathens, when in reality it is just a select few who truly have knowledge of how this is all *"legally"* taking place through tacit consent—such as members of the black robe mafia (to include Judge Willis B. Hunt Jr.), who are cold-hearted, calculated criminals that premeditatedly betray Americans *every single day*.

For this reason, the United States Federal Government takes special care to burry its true objectives and activity under mounds and mounds of red tape; all the while, thousands upon thousands of laws continue to find their way into law books, and the U.S. Government gallivants around the world *"legally"* wreaking havoc because before they EVER step foot on the battlefield or drop bombs on someone's head, you better believe that somewhere at some time, they have previously *"justified"* their actions on paper—which is why they are NEVER made to answer for anything they do. The ancient Roman philosopher/orator/lawyer/politician/consituttionalist/consul/political theorist *Cicero* said it best: **"the more laws, the less justice"**. The world needs to STOP looking at what the U.S. does and pay more attention to *HOW* they do it; then everything will make sense and all of their secrets will be revealed. It is the old *"sleight of hand"* magicians' trick; you cannot watch what the magician is doing

*or saying in front of your face, you have to pay attention to his other hand; and you better believe that the U.S. Government practices black magic.*

**COME NOW** PLAINTIFFS, in the interest of justice and for the preservation of the dignity of the U.S. Constitution, to move this Court as follows:

1) To DENY the Motion to Dismiss of the Defendants represented by and through their attorney, Raleigh W. Rollins, because ***THEY DO NOT HAVE STANDING*** to present claims in the name of the *de jure* people of Mitchell County Georgia; as they are ALL self-admittedly *"citizens of the United States"*.

2) To DENY the Motion to Dismiss of the Defendants represented by and through their attorney, Deborah Nolan Gore, because ***THEY DO NOT HAVE STANDING*** to present claims in the name of the *de jure* people of the State of Georgia; as they are ALL self-admittedly *"citizens of the United States"*.

3) Plaintiffs have 120 days to prosecute this action, and well within that time limit, shall summon the remaining defendants who have yet to appear thus far, and shall then move this Court for summary judgment, as there are

absolutely <u>NO</u> points of contention present within the present action that ANY of the Defendants have standing to raise. Thus, in the meantime, Plaintiffs now move this Court to **GRANT** a motion for injunctive relief to release Plaintiff Jason Joseph Clark from [unlawful] confinement, as it is an impossibility for Defendants to [lawfully] win the present action.

So it is, that Justice has spoken, this Thursday, October 2, 2014. And thus it is, sayeth She, that now begins, a New World Order. (<u>See</u> exhibit b).

For the **<u>UNREPRESENTED</u>** Plaintiffs,

*(Signed Thursday, October 2, 2014).*

Mrs. Tamah Jada Clark
6901-A N. 9th Ave #429
Pensacola Florida [32504]
(850) 512-6642
TamahJClark@gmail.com

## CERTIFICATION REGARDING PAGE AND TYPE LIMITATIONS

I, Mrs. Tamah Jada Clark, hereby certify that this Emergency Notice and Integrated Memorandum was written in 14-point Times New Roman font.

Mrs. Tamah Jada Clark
6901-A N. 9th Ave #429
Pensacola Florida [32504]
(850) 512-6642
TamahJClark@gmail.com

Signed Thursday, October 2, 2014

X:

exhibit 2
(50 pages)

IN THE SUPERIOR COURT OF GWINNETT COUNTY

STATE OF GEORGIA

STATE OF GEORGIA      )
                        )CRIMINAL ACTION FILE NUMBER:
vs.                     )
                        )    10-B-1786-9
JASON JOSEPH CLARK,    )
                        )
    Defendant.        )  **ORIGINAL**
                        )

## TRANSCRIPT OF GUILTY PLEA

Heard before the Honorable Tom Davis, Judge of the Superior Courts of the Gwinnett Judicial Circuit, in the Gwinnett Justice & Administration Center, 75 Langley Drive, Lawrenceville, Georgia, on August 9, 2010.

A P P E A R A N C E S:

For the State:               JAY HUGHES, ESQ.
                                 Assistant District Attorney
                                 Gwinnett Judicial Circuit
                                 75 Langley Drive
                                 Lawrenceville, Georgia 30046

For the Defendant:          CHARLTON ALLEN, ESQ.
                                 4229 First Avenue
                                 Tucker, Georgia 30085

                                 DAPHNE J. PARKER, ESQ.
                                 6045 Atlantic Boulevard
                                 Norcross, Georgia 30071

1     MS. HUGHES:  Your Honor, this is a non-negotiated
2     plea in the case of Jason Joseph Clark, 10-B-1786-9.
3     It is a speedy trial demand case that was called to
4     trial this morning.  Defense counsel, Mr. Charlton
5     Allen is present in the courtroom.  Ms. Daphne Parker
6     is also co-counsel on this case, and she is also
7     present.

8          The indictment charges the defendant with two
9     counts of aggravated assault, two counts of false
10    imprisonment, family violence battery, cruelty to
11    children in the third degree, possession of cocaine
12    with intent to distribute, and possession of marijuana
13    with intent to distribute.

14         At trial, Your Honor, the State's evidence would
15    show as follows:  On September 22nd, 2009, Gwinnett
16    County law enforcement communications received a 911
17    call that lasted approximately 30 minutes.  The
18    officer, Michelle Kenney took that phone call.  The
19    caller was a woman who did not identify her name, the
20    name of the perpetrator or the address.  But in that
21    call she described that she had been living in a
22    situation she described as being held hostage and her
23    mother being held hostage by the perpetrator, her
24    boyfriend.  She stated that she was calling 911
25    specifically to ask for help in being extracted from

| | |
|---|---|
| 1 | the residence so that she and her child and her mother |
| 2 | could be extracted. She stated that the defendant had |
| 3 | firearms and kept a loaded firearm within reach at all |
| 4 | times, and that there were drugs associated with the |
| 5 | defendant in the home. The 911 operator worked with |
| 6 | her to give her various phone numbers and plans on a |
| 7 | way to ask for assistance at the time that she was |
| 8 | ready for extraction, that is, a time when the |
| 9 | defendant was not present. That telephone call has |
| 10 | been recorded and Sergeant Chris Allen Smith -- that's |
| 11 | Allen, A-l-l-e-n, Smith, with the Gwinnett County |
| 12 | Police Department can identify the voice on that phone |
| 13 | as being that of one of the named victims on the |
| 14 | indictment, Tamal Wallace, based on his extensive |
| 15 | conversations with her on September 22nd, 2009. |
| 16 | On September 22nd, 2009, Tamal Wallace contacted |
| 17 | an administrative telephone number with the Gwinnett |
| 18 | County Police Department saying that now is a good time |
| 19 | to be extracted from the home, she, her infant child |
| 20 | and her mother. Officers came in marked -- an unmarked |
| 21 | vehicle, and specifically we have Officer Werho and |
| 22 | Sergeant Chris Allen Smith who extracted Tamal Wallace |
| 23 | and her infant son, Messiah, from the home which was |
| 24 | located at 6647 Meadow Green Circle in Norcross, which |
| 25 | is Gwinnett County. And that's on September 22nd, |

1    2009.

2         Tamal told the police that she needed to get some

3    more possessions for her child. They went into the

4    house, and at that point is where they saw what tested

5    positive for cocaine and scales in the house. They

6    also found --

7         THE COURT: Do you recall where it was located?

8         MS. HUGHES: It was located in the master bedroom

9    on the floor and on the bed. Tamal Wallace's statement

10   is that the defendant would start with a large amount

11   of cocaine, specifically crack cocaine, and take it out

12   of the house in smaller amounts, but that she and the

13   defendant were not users. There was also a marijuana

14   grow operation that was going on in the closet of the

15   master bedroom where exclusively male clothing was.

16   There was also fertilizer and other things that were

17   used to support the plants in the kitchen area. But

18   all of the marijuana plants were in the master bedroom

19   in the closet with the male clothes.

20        When Officers Gallant and Gurley went back into

21   the house with Tamal Wallace to get the additional

22   items for her baby, that is when they saw the drugs and

23   she pointed them out, described the defendant with

24   relation to the drugs, that is, that he sold them.

25   When they left that was probable cause for a search

1    warrant which Officer Gurley got for an extensive
2    search of the home. The officers who picked up Tamal
3    and Messiah immediately went to a school, a nearby
4    school to pick up Rosie Wallace, who is Tamal Wallace's
5    mother, and also lived in the residence there in
6    Gwinnett County. While they were taking Rosie and
7    Tamal and Messiah to the west precinct, there were
8    discussions about what had been going on in the home.
9    Rosie and Tamal stated that the violence from the
10   defendant was ongoing. It appeared to be escalating.
11   Rosie said that the reason she lived with Tamal and
12   Messiah was in order to protect her daughter from the
13   anger of the defendant. They both spoke specifically
14   about an incident on September 16th, 2009, which is
15   what they said was the most recent incident of more
16   extreme violence, and that incident is what forms the
17   basis for the charges in 10-B-1786-9.

18        While in the vehicle on the way to the west
19   precinct in a classroom setting in west precinct before
20   doing a written statement, both Rosie and Tamal Wallace
21   described what happened on September 16th, 2009. What
22   they related is at the defendant's residence, Tamal was
23   talking about having some relatives visit. This led
24   the defendant to go into a very quick rage. It was up
25   in the master bedroom. Tamal was upstairs in the

1    master bedroom with the infant, their infant child,
2    Messiah, when the defendant became very verbally
3    aggressive. Rosie heard the anger from the defendant
4    through the doorway and she made a comment to the
5    defendant trying to deflect his attention from Tamal.
6    The Defendant told Rosie Wallace to come into the room
7    and to sit on a chair in the bedroom. He then
8    proceeded -- the defendant then proceeded to tell Tamal
9    to lay face down on the bed. He took zip ties and
10   created a loop and zip-tied her arms behind her back.
11   While this was going on, Tamal's statement to the
12   police was that she was either punched or kicked in the
13   face. She was not sure which. Rosie's statement is
14   that Tamal was punched in the face at that time. The
15   infant Messiah was on the bed as this incident began.
16   Rosie Wallace, during the course of the incident, did
17   hold Messiah for part of the incident there in the same
18   room.

19        The defendant was armed with a gun during that
20   time before Tamal was placed face down. He pointed the
21   gun at her and threatened to kill her. He also while
22   Rosie was seated in the chair, threatened to shoot
23   Rosie in the femur area, that he would hit an artery
24   and that she would bleed to death.

25        Tamal estimated that she was bound with the zip

1    ties for approximately 30 minutes. She was very
2    conciliatory, very placating. Both of the women were
3    trying to be very submissive to calm the defendant
4    down. He eventually cut the zip ties from Tamal and
5    everybody went around that day as if nothing had
6    happened because this was the way that it was done
7    according to Rosie and Tamal. This is what they
8    communicated verbally on the way to the west precinct.
9    This is what they communicated in the classroom in the
10   west precinct to Officer Werho and to Sergeant Smith.
11   They also gave written statements that are consistent
12   with this. They are not as detailed as the verbal
13   statements, but they gave written statements that are
14   consistent with each of the elements of -- particularly
15   the crimes against persons.

16       Officers set up a watch at the house of the
17   defendant. The defendant eventually came to the house.
18   It looked like he was going to turn down the cul-de-sac
19   to his house and sort of pulled on -- drove on by not
20   stopping. He had a tag light out. The officers
21   stopped him and asked why he had driven past his house.
22   He denied that that residence, 6647 Meadow Green, was
23   his residence. He said he had stayed there that night,
24   the night before, but did not state it was his
25   residence. However, he was familiar that Tamal

1    Wallace, Rosie Wallace lived there. He -- when he was
2    stopped, he had a firearm in his glove compartment. He
3    said actually that it was there in the glove
4    compartment. And he stated that on --

5         THE COURT: He alerted officers to it before they
6    found it?

7         MS. HUGHES: He did. He alerted officers to the
8    firearm in the glove compartment before they were aware
9    of it. They were aware from Tamal -- they believed
10   from Tamal he was armed, but he did alert them ahead of
11   time.

12        In terms of September 16th, 2009, the defendant
13   stated that there was a verbal argument that day with
14   Tamal, but he denied that there was any physical
15   violence. A search of the residence found a AK47 with
16   a lot of ammunition for it, extensive amounts of
17   survival gear, industrial strength zip ties, and
18   including two zip ties that were cut that were by the
19   bed in the master bedroom.

20        In terms of trial, Your Honor, the Court had ruled
21   conditionally on a similar transaction witness
22   testifying. Is that something that you would want me
23   to include in this proffer, or since you have not heard
24   from her personally yet, would you prefer me not to?

25        THE COURT: No need. I have three questions that

1     come to mind immediately. First off, how old is

2     Messiah Wallace?

3          MS. HUGHES: I believe he was two, three, four

4     months old when this incident occurred.

5          THE COURT: Is the defendant the father of that

6     child?

7          MS. HUGHES: I've been told that he is. The

8     victim -- Tamal had said that he is.

9          THE COURT: How much cocaine was ultimately

10    discovered?

11         MS. HUGHES: There was very little cocaine there,

12    Your Honor. I will need to step to get that report.

13    Less than one gram.

14         THE COURT: The evidence of intent to distribute

15    was from the statement of Ms. Wallace?

16         MS. HUGHES: And scales located. Yes. Her

17    statement and the scales.

18         THE COURT: Any baggies found, anything like that?

19         MS. HUGHES: Not to my recollection.

20         THE COURT: With regard to the marijuana, was it

21    all basically in growing plants, or was there loose

22    marijuana found?

23         MS. HUGHES: Primarily growing plants.

24         THE COURT: And how many plants, if you recall?

25         MS. HUGHES: Five or six.

```
1              THE COURT:  Very well.

2              MS. HUGHES:  Mr. Clark, if you would, raise your

3        right hand, please.

4

5                        JASON JOSEPH CLARK

6

7              Having first been duly sworn, is examined and

8        testifies as follows:

9

10                       CROSS-EXAMINATION

11

12   BY MS. HUGHES:

13        Q    Please, state your full name for the Court.

14        A    Jason Joseph Clark.

15        Q    How old are you?

16        A    Thirty years old, ma'am.

17        Q    And what's your date of birth?

18        A    3/11/80.

19        Q    And if you would speak very loudly, not only for

20   the Court but for the court reporter.

21        A    Yes, ma'am.

22        Q    And what is your date of birth again?

23        A    3/11/80.

24        Q    Thank you.  Are you now under the influence of any

25   drugs, medicine or alcohol?
```

1     A    No, ma'am.

2     Q    How far did you go in school?

3     A    I completed high school.

4     Q    You can read and write the English language?

5     A    Yes, ma'am.

6     Q    Did you have a chance to read and examine

7  indictment 10-B-1786-9 charging you in this case?

8     A    Yes, ma'am.

9     Q    And do you fully understand the charges that the

10  Judge is now considering?

11     A    Yes, ma'am.

12     Q    Do you understand there are certain rights you

13  would have at trial?  That by pleading guilty today, you're

14  giving up those rights which include the following:  the

15  right to a trial by jury, the right to be presumed innocent,

16  the right to confront the witnesses against you, the right

17  to subpoena any witnesses for your defense, the right to

18  testify yourself and offer other evidence, the right to have

19  an attorney assist you throughout the trial, and the right

20  to not incriminate yourself?

21     A    Yes, ma'am.

22     Q    Do you also understand that if you plead not

23  guilty, or if you remain silent and enter no plea at all,

24  the State would be required to try you on these charges

25  before a jury?

1      A     Yes, ma'am.

2      Q     Now in terms of the specific charges that you are
3    facing, do you -- the total amount that you could possibly
4    serve is, for all of the charges, is 102 years. But in
5    terms of the specific counts, there's two aggravated assault
6    counts.

7                THE COURT:  I'll do it.

8                MS. HUGHES:  Thank you, sir.

9                THE COURT:  Count 1 carries a maximum -- the
10               sentence of aggravated assault carries a maximum
11               punishment of 20 years to be served in prison.  Count
12               2, which is a false imprisonment count, carries a
13               maximum possible punishment of ten years which can be
14               served in prison.  Count 3 appears to me to be indicted
15               as a misdemeanor family violence battery.

16               MS. HUGHES:  It is.

17               THE COURT:  So it carries an additional 12 months
18               possible sentence.  Count 4 is an aggravated assault,
19               once again, carrying a maximum possible sentence of 20
20               years in prison.  Count 5 is another false imprisonment
21               count which carries a ten year maximum.  Count 6
22               appears to me to be a misdemeanor cruelty to children.
23               There are no prior cruelty to children in the third
24               degree as alleged in the indictment, so it is a
25               misdemeanor as well, carrying an additional 20 -- 12

```
 1          months, I'm sorry.  Count 7 is a charge of possession
 2          of cocaine with intent to distribute.  It carries a
 3          sentence of between five up to a maximum of 30 years.
 4          And possession of marijuana with intent to distribute
 5          carries a maximum possible sentence of ten years to be
 6          served in prison.  Do you understand these maximum
 7          possible sentences for each of the counts to which
 8          you've entered your plea of guilty?
 9               DEFENDANT CLARK:  Yes, Your Honor.
10     BY MS. HUGHES: [Resuming]
11          Q    Mr. Clark, are you currently serving any sentence
12     in confinement, or are you now on probation or parole?  Are
13     you in confinement on any case other than being held for
14     here?
15          A    No, ma'am.
16          Q    Are you currently on probation?
17          A    No, ma'am.
18          Q    And are you currently on parole?
19          A    No, ma'am.
20          Q    If the Court sentence includes time to be served
21     on probation, you will be required to obey the following
22     general conditions of probation:  Do not violate the
23     criminal laws of any governmental unit; avoid injurious and
24     vicious habits, especially alcohol intoxication, narcotics
25     and other dangerous drugs unless lawfully prescribed; avoid
```

1  persons or places of disreputable or harmful character;

2  report to your probation supervisor as directed; permit that

3  supervisor to visit you at home or elsewhere; work

4  faithfully at suitable employment insofar as may be

5  possible; do not change where you live, where you work, move

6  outside the jurisdiction of the court or leave the state for

7  any period of time without the prior permission of your

8  probation supervisor; support any legal dependents you may

9  have to the best of your ability; submit to evaluations and

10 testing related to rehabilitation, participate in and

11 successfully complete rehabilitative programs as directed by

12 probation. Are you entering your plea with an understanding

13 of those general conditions of probation?

14      A    Yes, ma'am.

15      Q    Now has anybody used force, threats or promises

16 that are causing you to plead against your will?

17      A    No, ma'am.

18      Q    Are you satisfied with what your attorneys, Mr.

19 Charlton Allen and Ms. Daphne Parker have done for you in

20 this case?

21      A    Yes, ma'am.

22      Q    Do you need any additional time to speak with your

23 attorneys before we go ready -- go forward with this plea?

24      A    No, ma'am.

25      Q    Have you understood all the questions you've

1    answered so far?

2         A    Yes, ma'am.

3         Q    Understanding all rights, do you want to enter --
4    well, let's go back to what an _Alford_ plea is.

5              MS. HUGHES:  I believe, Mr. Allen, he is
6         requesting an _Alford_ plea?

7              MR. ALLEN:  Yes, he is.

8    BY MS. HUGHES:  [Resuming]

9         Q    Mr. Clark, is it your understanding hearing what
10   the evidence is that the State would have ready to present
11   at trial, is it your understanding that rather than going to
12   trial and risking what the outcome of trial could be in
13   terms of a guilty verdict and in terms of a sentence, that
14   you're choosing instead, even though you're still saying
15   you're not guilty, to go ahead and plead -- to go ahead and
16   get a non-negotiated plea from the Judge?

17        A    Yes, ma'am.

18        Q    And that's called an _Alford_ plea.  Understanding
19   all your rights, do you want to enter an _Alford_ plea to each
20   of the offenses on the indictment?

21        A    Yes, ma'am.

22        Q    And it's your decision to plea to this case being
23   made both freely and voluntarily?

24        A    Yes, ma'am.

25        Q    Are you a citizen of the United States?

```
 1      A     Yes, ma'am.

 2      Q     Now, all of these charges except for the family

 3   violence battery and the cruelty to children third degree,

 4   all the remaining charges, the aggravated assaulted, false

 5   imprisonment, possession of cocaine with intent to

 6   distribute and possession of marijuana with intent to

 7   distribute are felony charges. As felony charges, you have

 8   four years from sentencing if you wish to challenge your

 9   plea or the Court's sentence on a legal technicality.

10   That's done through a civil action called a habeas corpus

11   petition.  For the two misdemeanor counts, the family

12   violence battery and the cruelty to children in the third

13   degree, you have one year from sentencing if you wish to

14   challenge your plea or the Judge's sentencing on a

15   technicality also through a habeas corpus petition.  Do you

16   understand those deadlines?

17      A     Yes, ma'am.

18            MS. HUGHES:  That's all from the State at this

19      time, Your Honor.

20            THE COURT:  Does Mr. Clark have a prior criminal

21      history?

22            MS. HUGHES:  Your Honor, he has a conditional

23      discharge on a marijuana less than an ounce and a

24      misdemeanor arrest for solicitation that I believe was

25      a nolo.  And that's it.
```

```
 1          THE COURT:  What is the State's recommendation if

 2     the State has one?  I understand this is a completely

 3     non-negotiated plea; is that correct, Mr. Allen?

 4          MR. ALLEN:  Yes, Judge.

 5          MS. HUGHES:  Correct.

 6          THE COURT:  Does the State have a recommendation?

 7          MS. HUGHES:  It does, Your Honor.

 8          THE COURT:  What is it?

 9          MS. HUGHES:  Terms of an aggregate sentence, the

10     State's recommendation is 50 years to serve 30 years in

11     confinement.

12          THE COURT:  Let's talk a little bit about the

13     Alford plea before I turn it over to Mr. Allen, Mr.

14     Clark.  The United States Supreme Court ruled several

15     years ago that a defendant has the opportunity, if they

16     wish, to enter a plea of guilty although maintaining

17     their innocence because they feel that tactically it's

18     advantageous or wise for them to do so.  Is that what

19     you are doing in this situation?  Are you entering a

20     plea of guilty under Alford versus North Carolina for

21     tactical or strategic reasons?

22          DEFENDANT CLARK:  Yes, Your Honor.

23          THE COURT:  Do you believe that it's in your best

24     interest to do so?

25          DEFENDANT CLARK:  Yes, Your Honor.
```

1        THE COURT:  I'll accept it as an _Alford_ plea.  I
 2    find that based on the State's recitation of what the
 3    victim said initially in this case, that there is a
 4    clear factual basis covering the elements of all eight
 5    counts in the indictment.  So I will accept it as an
 6    _Alford_ plea although the law does not require me to do
 7    so.  So I wanted to go ahead and clear that up on the
 8    front-end of things.

 9        MR. ALLEN:  Thank you, Judge.

10        THE COURT:  Mr. Allen, tell me about your client.

11        MR. ALLEN:  As the State has reflected, my client

12    has no felony criminal history.  This is the first time

13    that he has been brought before the Court.  There was

14    an indication of something prior that we dealt with,

15    and a proffer on similar transaction, but that did not

16    result in charges being brought as a formal matter nor

17    did it result in any kind of a guilty plea or acquittal

18    or guilty verdict or anything of that nature.

19        THE COURT:  That's why I will not consider it in

20    aggravation.

21        MR. ALLEN:  Thank you, Judge.  If this case were

22    to come to trial, Your Honor, there would be

23    significant contradictions with what the proffer of the

24    State has been that were raised by the victims

25    themselves and multiple letters and notes to the

1   prosecutor's office, to the judge's office, some to me,
2   and some to other entities within the state -- within
3   the county government. Many of those contradictions
4   raised issues such as the possession of the drugs
5   belonging to an individual whom we've not been able to
6   ascertain. His name was Josh. That was raised in one
7   of those letters. We believe that because of the
8   nature of many of those contradictions that this would
9   be a very lengthy trial if it were brought up. And
10  that the two victims who were involved in it would be
11  under significant pressure on both sides, the State
12  side and the defense side in trying to cull out what
13  actually happened, if anything actually happened. And
14  those letters, and, of course, the other statements
15  that they've made would be brought in contradiction to
16  each other. And also, Your Honor, we are aware that
17  within the context of the reports of the officers as
18  they interviewed both of them, there was some bruising
19  supposedly found, but no photographs, yet none of the
20  bruising was consistent with some of the injuries
21  theoretically sustained. So our position has been at
22  this point -- up to this point, Your Honor, that my
23  client was willing to go through and deal with the
24  exigencies of a lengthy trial. However, because of the
25  way the witnesses were brought in, some, obviously

| 1 | because of actions of their own, he has been |
| 2 | incarcerated and not been in contact with any of the |
| 3 | witnesses since the original arrest date. His concern |
| 4 | is both for them, for the child and for what the |
| 5 | ultimate outcome might be with respect to any |
| 6 | sentencing upon the possibility of being convicted, |
| 7 | assuming that the jury believed the first set of |
| 8 | circumstances versus the recantations, even though |
| 9 | there are significant contradictions. |
| 10 | That said, Your Honor, he is willing to take |
| 11 | responsibility so that this does not continue. That |
| 12 | understanding that if we go through a trial, the two |
| 13 | witnesses may be detained through the entire trial |
| 14 | because they did try to escape. If there is for some |
| 15 | reason a mistrial or a hung jury, another trial might |
| 16 | would come out of it and they could be detained even |
| 17 | longer for a secondary trial. He is willing to go |
| 18 | forward with his plea, Your Honor, because of his |
| 19 | criminal record or the lack thereof. He is going to |
| 20 | request that the Court, on any sentence that it |
| 21 | decides, consider placing him on a sentence under the |
| 22 | First Offender Act, because this is the first time he |
| 23 | has been brought before a judge for anything other than |
| 24 | those two minor misdemeanor issues, one of which was a |
| 25 | nolo plea. |

1    He's got a child. He actually has two children.
2    He is wanting to be able to provide for them. Among
3    the considerations that he and I discussed with respect
4    to any of the sentencing was any of the possible
5    alternatives for him to be able to work even if the
6    Court decides to place him incarceration for a period
7    of time. Some alternatives to work so that he could
8    continue to support the child, or both children
9    actually that he's got, one from one mother and one
10   from another mother.
11   It is also my understanding, Your Honor, from
12   having interviewed the witnesses, that if we did move
13   forward with any type of plea, they wanted to be
14   available to make statements on his behalf and request
15   to the Court a consideration of their desires for any
16   subsequent sentencing.
17   Right now, Your Honor, we would request that the
18   Court -- obviously we would think that the 50 to serve
19   30 is a bit excessive, particularly given the level of
20   contradictions that exist in this case as to the
21   factual matters and the equal access problems that
22   exist so far as the drug possession problems,
23   testimonial problems relating to potential accomplice
24   liability, or unindicted accomplice liability that
25   could be brought against the women, that the Court

1    consider leveling a sentence in the neighborhood of ten
2    years probation with one to three years to serve, and a
3    sentencing alternative with respect to that to be
4    considered as a work alternative or prison work camp if
5    the Court wishes him to spend more time in jail.
6         He has been incarcerated since these events, since
7    his arrest on September 22nd or 23rd of '09, which is
8    amounted to just over ten months incarceration.  We
9    would at this point request the Court allow Ms. Tamal
10   Wallace and Rosie Wallace to make statements.
11        THE COURT:  First I want to talk to Mr. Clark.
12   Mr. Clark, is there anything you wish to say to the
13   Court?
14        DEFENDANT CLARK:  Yes, Your Honor.
15        THE COURT:  Are you the father of Messiah Wallace
16   to your knowledge?
17        DEFENDANT CLARK:  Yes, Your Honor.
18        THE COURT:  Beg your pardon?
19        DEFENDANT CLARK:  Yes, Your Honor.
20        THE COURT:  All right.  Go ahead.
21        DEFENDANT CLARK:  I just would like to accept
22   responsibility for the situation.  And I just pray that
23   it ends for everybody today.  Also, I have no hard
24   feelings or animosity or any discrepancies.  I just --
25   and I'm actually thankful for my time that I've spent

1    here. I've been able to use it to improve on a lot of
2    aspects, very important aspects of life. And I just at
3    this time, you know, I would like to plead for mercy on
4    your behalf so that I would return, you know, to
5    society as a positive member, as a good father, and
6    just a positive influence, period. And I will
7    absolutely comply with any requirements that the Court
8    sees fit.

9         THE COURT: I need to ask you a question. You
10   indicated a moment ago that you were taking
11   responsibility for this situation. And I need to know
12   exactly what that means to you. Because you're
13   entering your plea under <u>Alford versus North Carolina</u>,
14   which is a specific decision, not to admit that you did
15   anything wrong, and the law allows it and I will accept
16   it. But I'm confused by your later statement that you
17   are taking responsibility for this situation. What
18   exactly do you mean?

19        DEFENDANT CLARK: Well, as Mr. Allen stated, the -
20   - from what I understand, my son is in DFCS right now.
21   And both of the witnesses are in custody right now.
22   And from my understanding this procedure could last all
23   week to months. And I just -- I don't -- I don't wish
24   for that type of turmoil for all the parties involved.
25        THE COURT: All right. So you want to be

1    responsible for making the situation end, but you're
2    not taking responsibility for what's alleged in the
3    indictment; is that correct?

4        DEFENDANT CLARK: That's correct, Your Honor.

5        THE COURT: Okay. All right. Anything else you
6    want to tell me? You don't have to, but this is your
7    chance to do so.

8        DEFENDANT CLARK: Again, I just ask for your
9    mercy. And I just, you know, I can assure you I will
10   never be in your courtroom for a negative reason again.

11       THE COURT: All right. Deputy, I'm going to ask
12   you to put Mr. Clark at the table next to Ms. Parker.

13       Mr. Allen, you can remain at the podium so you can
14   question the witnesses. My understanding is you wish
15   to bring out Tamal Wallace first?

16       MR. ALLEN: Yes, sir.

17       MS. HUGHES: Your Honor, the State would not
18   presume to speak for Tamal Wallace or Rosie Wallace,
19   but in terms of a recommendation, if I may, there is a
20   no contact recommendation regarding the similar
21   transaction victims in this case. The State would
22   request no contact with Tonya Woodards, no contact with
23   Denise Woodards, and no contact except by court ordered
24   visitation for the defendant's child, Shani Clark;
25   that's S-h-a-n-i.

```
 1          THE COURT:  Is one of the Ms. Woodards the mother
 2    of Shani Clark?
 3          MS. HUGHES:  Yes, sir; Tonya is.
 4          THE COURT:  Okay.  Mr. Allen.
 5          MR. ALLEN:  Since we haven't really gotten into
 6    the area of facts surrounding the similar transaction,
 7    I don't think that that can be covered in the sentence
 8    related to these specific allegations.  There is,
 9    however, a TPO in place which my client, if and when he
10    is released, would completely honor because he
11    understands the circumstances surrounding the TPO that
12    Mr. Woodards filed back in December following
13    substantial phone calls between the two of them while
14    they were in the jail.  So I don't think that's really
15    -- would be a proper part of the sentencing structure
16    of this plea on the allegations in front of us.
17          THE COURT:  Well, I might agree with you if we
18    were talking about restitution for some matter that was
19    not pled to.  But it seems to me that I can enlist
20    reasonable conditions of probation that appear to be
21    related to making sure that the defendant complies with
22    the dictates of the law.  So I'm going to think about
23    that one for a moment.  I'll give y'all a chance to
24    argue it later briefly if I decide that I would like to
25    impose those conditions with regard to the similar
```

1    transaction witnesses.  Let me mull that one over for a

 2    few minutes and then we'll talk about it again if it

 3    looks like something that I'm inclined to do.

 4              MR. ALLEN:  Yes, sir.

 5              THE COURT:  All right.  Bring out Tamal Wallace,

 6    please.

 7              [Whereupon, Tamal Wallace enters courtroom.]

 8              THE COURT:  Are you Tamal Wallace?

 9              MS. TAMAL WALLACE:  Yes, sir, I am.

10              THE COURT:  Ms. Wallace, I have been asked to

11    bring you out from the holding cell so that you can

12    testify in the defendant's case in extenuation and

13    mitigation of his defense.  Mr. Allen has asked that

14    you be brought out for that purpose.

15              I want to advise you before you testify that no

16    one can require you to incriminate yourself in any way.

17    That you have the absolute right to remain silent if

18    you think that the answers to any questions that Mr.

19    Allen or the State, or for that matter the Court, might

20    ask you would tend to incriminate you.  There's a

21    provision in Georgia law that says no one can force you

22    to testify against your will if you think that is the

23    case.

24              Now, I don't know what forms that possible

25    incrimination might take except for one obvious one

```
 1        which is that you are already on record as telling

 2        different versions of the events that happened on

 3        September the 16th, 2009, which might give rise to

 4        whether or not you possibly made a false report of a

 5        crime back at that time, or whether or not you have

 6        changed your story for some other reason.  That is the

 7        only possible criminal action that I foresee based on

 8        my limited knowledge of the case.  But I do feel it

 9        incumbent upon me to advise you that there is at least

10        that possibility.

11            I will bring you up to speed and tell you what's

12        happened in here this morning.  Mr. Clark has just

13        entered a plea of guilty.  You need to look at me.

14            MS. TAMAL WALLACE:  I'm sorry.

15            THE COURT:  And pay attention to me.

16            MS. TAMAL WALLACE:  Okay.

17            THE COURT:  Mr. Clark has just tendered a plea of

18        guilty to all eight counts of the indictment.  Now,

19        he's done so under a United States Supreme Court case

20        called Alford versus North Carolina which gives him the

21        opportunity to enter a plea of guilty for tactical or

22        strategic reasons while maintaining that he didn't do

23        anything wrong.  I'm not required to accept such a plea

24        from anyone, but I have done so in this case.  I have

25        accepted his plea of guilty.  He is basically not
```

1    admitting guilt but wishes to plead guilty to avoid the
2    possible consequences of going to trial and getting
3    found guilty at a trial. That's what's happened so far
4    since you've been upstairs. Mr. Allen has asked me to
5    bring you out from the holding cell because he believes
6    that you wish to speak to what my sentence should be in
7    this case or that you wish to speak in support of Mr.
8    Clark.
9        So my first question to you is, do you wish to
10   testify on behalf of Mr. Clark or for any other
11   purpose? As one of the listed victims in this
12   indictment, you have the absolute right to speak to me
13   if you wish to do so. Do you wish to do so?
14       MS. TAMAL WALLACE: When you say, do I wish to
15   testify, do you mean like you would take away this plea
16   and I testify.
17       THE COURT: No. I mean to testify as part of the
18   sentencing procedure in this plea. Mr. Allen indicated
19   to me that he thought you wanted to come out and say a
20   few words, and I'm going to give him the opportunity to
21   ask you questions if you wish to testify. One other
22   thing. Understanding that you are currently
23   incarcerated as a material witness in this case, before
24   we finish with this matter today, we're going to deal
25   with that issue as well. All right. So that's not

1    going to be left undealt with.

2        MS. TAMAL WALLACE:  What do you mean by deal with

3    it?

4        THE COURT:  I mean I'm going to bring you back out

5    at the conclusion of the plea, and should the plea

6    continue to be maintained by Mr. Clark, I anticipate

7    that I would release you.  But I need to do that on the

8    record.

9        MS. TAMAL WALLACE:  Okay.

10       THE COURT:  My question for you at this time is,

11   do you wish to speak either for yourself as a listed

12   victim in this case, or do you wish to speak now on

13   behalf of Mr. Clark?  Either or both.

14       MS. TAMAL WALLACE:  I wish to speak on behalf of

15   Mr. Clark.

16       THE COURT:  Very well.  Mr. Allen, I'll ask you to

17   swear the witness in and you may question her.

18       MR. ALLEN:  Thank you, Your Honor.

19       THE COURT:  Take care with that oath, because I

20   take it seriously.  You understand?

21       MS. TAMAL WALLACE:  Yes, sir.

22

23                   TAMAL WALLACE

24

25       Called as a witness by the Defense, having first

```
 1    been duly sworn, is examined and testifies as follows:

 2

 3                      DIRECT EXAMINATION

 4

 5    BY MR. ALLEN:

 6        Q    Introduce yourself, please, for the court record.

 7        A    My name is Tamal Wallace.

 8        Q    What relationship are you to Jason Joseph Clark?

 9        A    We have a child together.

10        Q    Jason Joseph Clark has just entered a plea of

11    guilty to the allegations that were brought out from

12    September 16th.  Do you remember the allegations that were

13    done -- charged as a result of the actions on that day?

14        A    No, sir.

15        Q    Okay.  You don't remember any of the allegations?

16        A    Can I read right now?

17             THE COURT:  You have a copy of the indictment

18        there, Charles?

19             MR. ALLEN:  Yes, I do.

20             THE COURT:  You can take a look at them.  Take

21        whatever time you need to read them.

22             MS. TAMAL WALLACE:  Thank you.  [Reviews

23        indictment.]

24    BY MR. ALLEN:  [Resuming]

25        Q    Do you understand what Mr. Clark is here for
```

1    today?  The charges that are pending, do you understand
2    those?

3         A    Not exactly.

4         Q    But you read what the document said?

5         A    Yes.

6         Q    Okay.  He's already entered a plea on those as the
7    Judge has reflected.  So I'm not really going to go over the
8    facts that are underlying the charges.  The State's already
9    laid down their initial facts.  But I want to ask you just
10   some other questions.  First of all, how old is the child
11   that you and Jason have?

12        A    He's a year old.

13        Q    You need to speak loudly so the court reporter can
14   hear.

15        A    He's a year old.  His name is Messiah.

16        Q    When was he born?

17        A    He was born July 16th of 2009.

18        Q    Prior to the time that Mr. Clark was arrested did
19   Mr. Clark participate in raising and supporting the child at
20   all?

21        A    Yes, he did.  Even though we didn't live together,
22   he would come by to visit every couple of days.  He would
23   call at least once a day to make sure that I was getting
24   everything that I was supposed to as far as nutrition and
25   stuff.  He went to every doctor's appointment, every single

1    appointment.

2        Q    Did he supply money in support of your child as
3    well as you?

4        A    He supplied the house with diapers and different
5    stuff like that.

6        Q    Did he buy things for you, ma'am?

7        A    Like gifts?

8        Q    No, but I mean, did he buy things for the baby?

9             THE COURT:  Did he buy any items for the child?

10            MS. TAMAL WALLACE:  Yes, sir.  He did anything and

11       everything possible for the child.  He was there when

12       he was born the whole time.  He was there holding my

13       hand.  Like he was there every step of the way, doing

14       every and anything he possibly could and more.

15   BY MR. ALLEN:   [Resuming]

16       Q    Since his incarceration has he been able to supply
17   any help with you with the child?

18       A    No, not at all.  They won't let him see him.  They
19   won't let him see him or anything.

20       Q    But he's also been incarcerated so he's not had a
21   job; is that correct?

22       A    That is correct to the best of my knowledge.

23       Q    Now, all of this came about as a set of facts that
24   the State has proffered to the Court already.  I've got a
25   couple of questions I want to follow up, not on the facts,

1  but in relationship to those with the charges and the fact
2  that he's entered a plea. Are you afraid of Mr. Clark or of
3  him having contact with you or your child for any reason?

4      A    No, not at all. I actually pray for the opposite.
5  I want him to be there for his son. His son really needs
6  him. I mean, he's a little boy and there's only so much
7  that I can do for him as his mother. I can, you know,
8  clothe him and feed him, but he needs his father. He needs
9  his creator, you know, to show him certain things. Jay is a
10  great father. He's never been, you know, anything other
11  than that.

12      Q    If the Court put him on probation for any reason,
13  is there -- are any reservations or concerns that you would
14  have with him interacting with the family or being able to
15  support you or anything of that nature?

16      A    No. In fact, I would request if it was possible
17  for us to -- because at that time, right after the baby was
18  born, we were actually trying to make plans to live together
19  so we could all be a family. So that's actually what I'd
20  prefer at this point.

21      Q    Assuming that that's not going to happen, that
22  perhaps the Judge will give him some time to serve, what
23  would be your position on that? And would you want the
24  Court to make it possible, if he does have to serve, to be
25  able to get some kind of employment or money and help for

1   your support?

2       A    Could you ask me that again?

3       Q    I'll try to break it down. If the Court decides
4   he needs to spend more time in jail, what would be your
5   preference as to any length of time? Do you have an idea as
6   to how long?

7       A    The absolute least possible. I wish -- I don't
8   know. The absolute least amount of time possible. Like I
9   said, I want us to all live together as a family. I don't
10  feel afraid of him in any way, shape or form. Like I said,
11  his son really, really, really needs him; he really does.

12      Q    If the Court were considering a sentence
13  alternative that would allow him to work in some fashion
14  through the prison system, would that be helpful to you?

15      A    If it allowed him to gain some type of money or
16  financial gain, then yes, it would, because I'm sure --
17  there's no doubt in my mind that he would contribute
18  whatever he could to his son.

19          MR. ALLEN:  Thank you. That's all I've got right
20      now, Judge.

21          THE COURT:  Ms. Hughes, do you have any questions?
22          MS. HUGHES:  I do not, Your Honor.

23          THE COURT:  Why were the police called in the
24      first place? Why did y'all call them?

25          MS. TAMAL WALLACE:  I don't --

1           THE COURT:  You don't what?

2           MS. TAMAL WALLACE:  I don't remember that.

3           THE COURT:  You don't remember.  Who was it that

4    made the initial phone call?

5           MS. HUGHES:  Tamal Wallace.

6           THE COURT:  The 30 minute conversation about how

7    they had been held and they were looking for an exit

8    strategy?

9           MS. HUGHES:  Actually there was a call a week or

10   so before from an unidentified male describing this

11   exact situation and then a 30 minute call from Tamal

12   Wallace.

13          THE COURT:  Initiated by Tamal Wallace?

14          MS. HUGHES:  To 911.

15          THE COURT:  You don't remember making that phone

16   call?

17          MS. TAMAL WALLACE:  No, sir.

18          THE COURT:  In which you described the horror of

19   the situation that you and your mother found yourselves

20   in, and about asking for a way to try to get out of

21   that situation at an opportune time such as when Mr.

22   Clark wasn't present.  You don't remember making that

23   phone call?

24          MS. TAMAL WALLACE:  No, sir.

25          THE COURT:  And that call is recorded?

1           MS. HUGHES:  Yes, sir, it's recorded.

2           THE COURT:  Who made the second call?  Was it

3      Tamal or Rosie?

4           MS. HUGHES:  Tamal.  She made --

5           THE COURT:  You don't remember making the second

6      call that led to the police extracting you from the

7      house?

8           MS. TAMAL WALLACE:  No, sir.

9           THE COURT:  You don't remember what you told the

10     police that day?

11          MS. TAMAL WALLACE:  No, sir.

12          THE COURT:  I have no further questions.  Anything

13     else for this witness?

14          MR. ALLEN:  No, Your Honor.

15          THE COURT:  All right.  Please take her back.

16     Keep her upstairs because I will be needing to bring

17     her back out shortly.

18          [Whereupon, Ms. Tamal Wallace returns to holding

19     cell.]

20          THE COURT:  Will you bring out Rosie Wallace?

21          [Whereupon, Rosie Wallace is brought before the

22     Court.]

23          THE COURT:  Let the record reflect that a witness

24     has been brought out from the holding cell.  Ma'am,

25     your name, please.

1        MS. ROSIE WALLACE:  Rosie Wallace.

2        THE COURT:  All right.  Ms. Wallace, Mr. Allen has

3    asked that you be brought out as a possible witness on

4    behalf of Mr. Clark.  I would also like to let you know

5    that you have the right to make a statement to the

6    Court as one of the listed victims in the case as well.

7    So just to bring you up to speed, Mr. Clark, a few

8    moments ago entered a plea of guilty to all eight

9    counts of this bill of indictment.  He did so under a

10   United States Supreme Court case called <u>Alford versus</u>

11   <u>North Carolina</u>.  He chose not to admit that he did

12   anything wrong, but yet he wished to enter a plea of

13   guilty as a tactical decision rather than run the risk

14   of what might happen to him at the end of a trial.

15   Okay.  So he has not taken responsibility for the

16   offenses that you are a victim of, nor for the offenses

17   that Messiah Wallace or Tamal Wallace are victims of,

18   nor for the status offenses such as the possession of

19   the drugs.  I don't believe that you ever sent me a

20   letter did you?

21       MS. ROSIE WALLACE:  [No verbal response.]

22       THE COURT:  I believe I was sent a letter by your

23   daughter, but I don't recall ever receiving one from

24   you.  Did you ever send a letter to the Court about

25   this matter?

1    MS. ROSIE WALLACE:  [No verbal response.]

2    THE COURT:  Do you remember?

3    MS. ROSIE WALLACE:  No, sir.

4    THE COURT:  Okay.  You have the right not to

5    testify this morning if you believe that your answers

6    might tend to incriminate you in any way.  I know that

7    for your daughter -- on your daughter's situation that

8    she initially called the police and got this whole case

9    rolling by making certain complaints about Mr. Clark

10   and then she recanted those several times apparently in

11   letters to the various people and things like that.

12   MS. ROSIE WALLACE:  Yes, sir.

13   THE COURT:  I don't know if you've written any

14   letters to anybody or not.  I do know that according to

15   the State's case this morning, you made certain

16   statements to the police about what went on on

17   September the 16th, 2009, involving these charges.  I

18   just want to make sure you understand that changing

19   your statement could subject you to criminal

20   prosecution for false report of a crime.  If you lie

21   under oath, you could be prosecuted for perjury and I

22   want to make sure that you understand those things

23   before deciding whether or not you wish to answer any

24   of Mr. Allen's questions or not.  Okay.  Do you

25   understand that?

1          MS. ROSIE WALLACE:  Yes, Your Honor.

2          THE COURT:  All right.  Do you wish to testify on

3     behalf of Mr. Clark or for any other reason?

4          MR. ROSIE WALLACE:  Um --

5          THE COURT:  Just give me a yes or no first.  Do

6     you want to testify?

7          MS. ROSIE WALLACE:  No, sir.

8          THE COURT:  No.  All right.  Take her back.  Once

9     again, hold her upstairs as well because we will have

10    to deal with the material witness issue in a few

11    moments.

12    [Whereupon, Ms. Rosie Wallace returns to holding cell.]

13         THE COURT:  Mr. Allen, would you come back up to

14    the podium.  All right.  Mr. Allen, I'll hear closing

15    comments from you and\or Mr. Clark if you have any.

16         MR. ALLEN:  Your Honor, based on the statements

17    from Tamal and the need for assistance in helping raise

18    her child, we would request that the Court consider a

19    largely probated sentence for Mr. Clark.  I had

20    suggested the Court consider something along the order

21    of ten to do three with perhaps combined sentencing

22    alternatives that allow him to work.  And I would

23    request that the Court also consider placing him under

24    sentence on the First Offender Act.

25         THE COURT:  Ms. Hughes, anything else?

1   MS. HUGHES: Yes, sir. The State would oppose the
2   First Offender Act because of evidence of an ongoing
3   nature of violence, extreme violence and escalating
4   violence including the physical evidence of the
5   handgun, the AK47, the zip ties including the two cut
6   zip ties by the bed.

7   THE COURT: All right. Take Mr. Clark back to the
8   holding cell. I'm going to recess for about five
9   minutes to consider the sentence in this matter.

10      [Whereupon, a brief recess is taken.]

11   THE COURT: We're back on the record in the State
12   versus Clark, 10-B-1786-9. I've listened carefully to
13   what everyone's had to say here today. I am mindful of
14   some of the history of this case. Unfortunately, I've
15   been much more involved in the procurement of the
16   witnesses in this case than I usually am based on the
17   fact that the material witnesses fled the jurisdiction
18   to avoid testifying. Based on the fact that they have
19   indicated that -- or changed their stories about what
20   went on, and I have been inextricably brought into it
21   for those reasons. So I'm a little more familiar with
22   this situation than I am with others.

23      In a civilized society people should not have to
24   be confronted with what I would call practical
25   enslavement, which is what's happened in this case. I

1     cannot account for Tamal Wallace's lack of memory in
2     front of me a few moments ago.  I can't account for how
3     it is that she can't recall a 30 minute conversation
4     that she had with the Gwinnett County Police Department
5     where she called them looking for their help.  I cannot
6     account for that in any way other than she must have
7     been subjected to such trauma for such a period of time
8     that she's blocked it out.

9          I choose to believe the original complaint of this
10    case.  I choose to believe the original statements made
11    in this case.  And it is on that basis that I enter a
12    finding of guilt with regard to all eight counts
13    because I believe that the true story was the first
14    story.  I cannot account for the change in the stories
15    on the parts of the victims in this matter.  I have
16    seen nothing to suggest that Mr. Clark tried to
17    influence them from jail.  So I don't know whether that
18    happened or not.  I don't know whether or not Ms.
19    Wallace all of the sudden realized that their
20    complaints were going to make it possibly very hard for
21    her to receive any support from Mr. Clark for their
22    child.  These things are a surpassing mystery to me.
23    But I am left with the inescapable conclusion that
24    these people were mistreated beyond all measure and
25    mistreated in horrible ways.  And that is what I am

```
 1        here to deal with today.

 2             I note for the record that although I have allowed

 3        you to enter your plea of guilty under Alford versus

 4        North Carolina, Mr. Clark, you take no responsibility

 5        for your actions.  You might as well have stood here

 6        and denied them as far as the effect that your plea

 7        posture has on what I think I should do in this case.

 8             Sentencing tries to accomplish many things.  And I

 9        am fond of saying, and there are a lot of people in

10        this courtroom that over the last five years have heard

11        me say the following: I am much more inclined to search

12        my heart to try to give somebody a break or cut

13        somebody some slack when they stand up here and look me

14        in the eye and say:  I did it, Judge.  I didn't do it

15        because I had a bad childhood.  I didn't do it because

16        somebody else looked at me ugly one day.  I didn't do

17        it because I lacked a certain amount of self-esteem

18        because of something that happened early to me in my

19        life.  I did it.  It was wrong.  I know it, and I'll

20        carry the weight for it.  Those are the people who have

21        already learned something in the run up to them coming

22        before me.  As far as I can tell, Mr. Clark, you've

23        learned nothing.  It remains only for me to announce

24        the sentence in this case, and I do so at this time.

25             On Count 1, for the offense of aggravated assault,
```

1    I sentence you to 20 years to be served in confinement
2    in the state prison system.

3         On Count 4, for the offense of aggravated assault,
4    I sentence you to 20 years to serve in the state prison
5    system.  That charge to run concurrently with Count 1.

6         On Count 2, for the offense of false imprisonment,
7    I sentence you to ten years to serve in the state
8    prison system to be served consecutively to Counts 1
9    and 4.

10        On Count 3, I sentence you to 12 months to serve
11   in confinement.  That sentence will run concurrently
12   with the sentence in Count 1.

13        On Count 5, I sentence you to ten years to be
14   served in the state prison system.  That ten years will
15   run concurrently with the ten years to which I
16   sentenced you with regard to Count 1.

17        Count 6, I sentence you to 12 months to serve in
18   confinement to run concurrently with Count 1.

19        On Count 7, I sentence you to ten years on
20   probation to run consecutively to Count 2.

21        On Count 8, I sentence you to ten years on
22   probation to run consecutively to Count 7.

23        By my estimation, you have received a sentence of
24   50 years with the first 30 years to be served in
25   confinement in the state prison system.

1      You shall pay a fine in the amount of $3,000 along

2      with applicable fees and surcharges, a $34 per month

3      probation supervision fee. As a special condition of

4      probation you shall have no violent contact with Tamal

5      Wallace or Rosie Wallace. You shall have no -- I have

6      considered the issue of the similar transaction

7      witnesses. I am not inclined to make any proposal with

8      regard to them because they are not listed victims in

9      the case. They can certainly seek a permanent

10     protective order at any time. That would have the same

11     effect as a 30 year condition of probation that I might

12     have imposed. And I urge them to do so if they are

13     concerned about that. Do you have any questions about

14     your sentence, sir?

15             DEFENDANT CLARK: No, Your Honor.

16             THE COURT: Mr. Allen, anything else?

17             MR. ALLEN: No, Your Honor.

18             THE COURT: Ms. Hughes?

19             MS. HUGHES: Your Honor, there would also be no

20     violent contact perhaps with Messiah Wallace, also a

21     named victim.

22             THE COURT: That would be fine.

23             MS. HUGHES: Thank you.

24             THE COURT: Go with the deputy. Once you have him

25     down -- at least moved downstairs, bring out Tamal

1    Wallace.

2         [Whereupon, Deputy complies with request of the

3    Court.]

4         [Whereupon, Tamal Wallace is brought before the

5    Court.]

6         THE COURT:  I have before the Court at this time a

7    material witness who was taken into custody down in the

8    state of Florida, transported back and housed in the

9    Gwinnett County jail over the weekend.  You are Tamal

10   Wallace; is that correct?

11        MS. TAMAL WALLACE:  Yes, sir.

12        THE COURT:  The requirement that you be held in

13   order to potentially testify in the trial of this case

14   having expired, I will release you at this time with

15   one possible caveat.  It's my understanding that you

16   were supposed to be over at juvenile court at 12:30 for

17   a deprivation hearing.  Is that your understanding as

18   well?

19        MS. TAMAL WALLACE:  They said something about

20   something like that.

21        THE COURT:  My suggestion to you is that if I

22   order you released right now that the deputies would

23   have to take you back over to the jail.  You would be

24   released from the jail, and, quite frankly, you might

25   miss that 12:30 hearing.  My suggestion is that you

1    remain in custody long enough for me to order you

2    transported over to the juvenile court building which

3    is only about 400 yards away so that you can make sure

4    that you appear for the matter involving your child in

5    juvenile court. Once that hearing is over, then you'll

6    be taken back to the jail and you will be released

7    assuming there are no other holds on you. As far as I

8    know the only reason that you're in custody is on my

9    material witness warrant. Does it suit you to do it

10   that way to make sure that you don't miss the hearing

11   at 12:30?

12         MS. TAMAL WALLACE: Yes, sir.

13         THE COURT: All right.

14         MS. TAMAL WALLACE: Thank you.

15         [Whereupon, Ms. Tamal Wallace returns to the

16   holding cell.]

17         THE COURT: Bring out Rosie Wallace.

18         [Whereupon, Ms. Rosie Wallace is brought before

19   the Court.]

20         THE COURT: Ms. Wallace, you've been brought out

21   from the holding cell so that I could deal with the

22   issue of your being held as a material witness.

23         MS. ROSIE WALLACE: Yes, sir.

24         THE COURT: There being no further requirement

25   that you testify in this matter since it's been

1    concluded, I'm going to order you released at this
2    time.

3        MS. ROSIE WALLACE:  Thank you.

4        THE COURT:  Now, there apparently is a hearing

5    over at juvenile court at 12:30 concerning the possible

6    deprivation of Messiah Wallace.  Is it your desire to

7    be present to possibly testify with your daughter in

8    that hearing?

9        MS. ROSIE WALLACE:  Yes, Your Honor.

10       THE COURT:  All right.  Here's what I suggest.  My

11   suggestion is that you remain in custody so that I can

12   have you transported over to juvenile court right now.

13   Once that hearing is concluded, you will be taken back

14   to the jail and released at that time.  Is that okay

15   with you?

16       MS. ROSIE WALLACE:  Yes, Your Honor.

17       THE COURT:  Because if I send you back to the jail

18   right now, there's an excellent chance that you won't

19   get processed out in time to make it back over here for

20   the 12:30 hearing.  Do you understand?

21       MS. ROSIE WALLACE:  Yes, Your Honor.

22       THE COURT:  So you will be released some time

23   later today.  You understand?

24       MS. ROSIE WALLACE:  Yes.

25       THE COURT:  All right.  You can take her back.

```
 1      I'd also like, if you can, to make sure you get her
 2      transported over to juvenile court as well as a
 3      potential witness over there.
 4          MS. HUGHES:  Your Honor, I have a request from our
 5      investigators to see whether it would be possible to
 6      procure Tamal Wallace's and Rosie Wallace's okay that
 7      we could release their property to their relatives.
 8      That was property we had here in the DA's office.
 9          THE COURT:  Ms. Wallace, is that okay with you?
10          MS. ROSIE WALLACE:  Yes, Your Honor.
11          THE COURT:  Is Tamal Wallace still here?  Have her
12      stick her head out.  That will expedite some of the
13      deal at the jail to have property.  That should get you
14      out of the jail quickly.
15          [Whereupon, Ms. Rosie Wallace returns to holding
16      cell.]
17          THE COURT:  Ms. Hughes, since these were your
18      witnesses, I'm going to ask you to prepare any sort of
19      order that the sheriff's department needs in order to
20      release them and I'll sign that instanter.
21          MS. HUGHES:  Yes, sir.
22          [Whereupon, Ms. Tamal Wallace is brought before
23      the Court.]
24          THE COURT:  Ms. Wallace?
25          MS. TAMAL WALLACE:  Yes.
```

THE COURT:  I am told that you have personal
possessions that are in the custody of the district
attorney's office and they want to know if they can
just go ahead and release those to your family members
or friends that may be in the audience back there.

MS. TAMAL WALLACE:  Is it okay if I wait until I'm
done and go get them or is it better to go ahead and
give it to them now?

THE COURT:  It will move things along quicker if
you let them -- I want you to turn around and look.  Do
you have folks back there you're related to?

MS. TAMAL WALLACE:  Yes, sir.

THE COURT:  Do you trust them with this property,
whatever it is?

MS. TAMAL WALLACE:  Yes, sir.

THE COURT:  All right.  Is it okay then if the
DA's office releases it directly to them?

MS. TAMAL WALLACE:  Yes, sir.

THE COURT:  It will help you get out of the jail
and be done with this matter quicker if they can go
ahead and get that property for you.

MS. TAMAL WALLACE:  Thank you.

THE COURT:  Okay.  Go back with the deputies and
we'll get you moved over to the juvenile court.

[Whereupon Guilty plea is concluded.]

CERTIFICATE

STATE OF GEORGIA

COUNTY OF GWINNETT

I, Marsha Perkins, Certified Court Reporter, B-2454, hereby certify that the foregoing pages numbered 2 through 49 constitute a true, complete and accurate transcript of a guilty plea in the case of <u>State vs Jason Joseph Clark</u>, heard before the Honorable Tom Davis, Judge of the Superior Courts of the Gwinnett Judicial Circuit, Gwinnett County Case No. 10-B-1786-9, taken down by me and transcribed under my supervision to the best of my ability.

I further certify that I am a disinterested party to this action and that I am neither of kin nor counsel to any of the parties hereto.

This certification is expressly withdrawn and denied upon disassembly, photocopying, or duplication in any manner or upon certification of the foregoing transcript or any part thereof by any person or entity other than by me. This certification is further expressly withdrawn and denied absent my original signature and original seal appearing hereon below.

In witness whereof, I hereby affix my hand on this the 18th day of January, 2011.

_Marsha Perkins_

Marsha Perkins, CCR B-2454

From:
Jason Joseph Clark &
Tamah Jada Clark
6901-A N. 9ᵗʰ Ave. #429
Pensacola Florida [32504]

Certified Mail #: 7011 1570 0001 1520 4566

To:
John Kerry
U.S. Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Monday, July 21, 2014

RE: UNILATERAL ACT OF STATE AND UNILATERAL TREATY

Dear Mr. Secretary:

It is requested in advance that you forgive the bombardment of written requests and other communications addressed to you that the Law occasions for its proper observance. Myself, (Tamah Jada Clark), and my husband, (Jason Joseph Clark), are now writing you in respect of the attached Unilateral Act of State and Unilateral Treaty.

As you know, it is nearly impossible to even subsist in America (e.g. on the "U.S." land mass) without interaction with the *current* United States; and, completely impossible to realize the exercise of the unalienable rights recognized under the organic U.S. Constitution for the Republic—i.e. justice, peace, tranquility, prosperity, and the pursuit of happiness—without, at least, proper identification.

Naturally, being that we are neither part of your State—and are thus, without U.S. citizenship or nationality—nor willing or obligated to admit the non-desirable (in my opinion) condition/status of "refugee" or "asylee"; we are left with very few options for lawfully obtaining identification and other basic and vital legal documents necessary for everyday human interaction.

It can only be expected that there is not already established a specified procedure for accomplishing these ends. As such, we have put a lot of time and research effort into solving this riddle. What we have come up with is the aforesaid Act and Treaty, which may be cited as the Unilateral Act of State of 2014 and the Treaty of Columbia, respectively.

We intend for them to be regarded as a unilateral Convention of sorts to insure that we receive proper treatment and justice in this land, in that these two documents seek, to establish a lawful and mutually respectful basis of interaction between ourselves and the *current* U.S., in a manner consistent with Natural Law, universally-recognized human rights, International Law (private and public), the organic U.S. Constitution for the Republic, and the laws of the present U.S. democracy.

It is not our intent to derail, degrade, or interfere with the private affairs of others. To the contrary, it is our intent to fulfil our duty and right of inheritance to live as freemen in this land; notwithstanding its systematic subjugation to silent quasi-legal, "unofficial/official" military occupation and martial law currently in place.

For personal reasons, that have yet to be revealed, we shall hereinafter refer to ourselves—Mr. Jason Joseph Clark and Mrs. Tamah Jada Clark (including our posterity)—collectively, as *Consonantia Divina*; an independent and international American moral person. Our Constitution will be forwarded to you, for your information and records.

Enclosed you will find the Unilateral Act of State of 2014, as well as the Unilateral Treaty of Columbia, which shall jointly be referred to as the Convention for Justice.

Kind Regards,

**Tamah Jada Clark**
TamahJClark@gmail.com
(850) 512-6642
6901-A N. 9th Avenue #429
Pensacola Florida [32504]


Enclosure:

Unilateral Act of State of July 21, 2014
Unilateral Treaty of Columbia of July 21, 2014

2 & 6

# 𝕮𝖔𝖓𝖘𝖔𝖓𝖆𝖓𝖙𝖎𝖆 𝕯𝖎𝖛𝖎𝖓𝖆

## UNILATERAL ACT OF STATE

### July 21, 2014

No man has a natural authority over his fellow, and force creates no right; it has been concluded that conventions form the basis of all legitimate authority among men[1]; therefore be it hereby enacted, by way of Natural Congress:

(Properly Cited)

*"The Unilateral Act of State of 2014"*

*An Act to establish the lawful and recognizable character of Consonantia Divina as a diverse and distinct self-determining native inhabitant of central North America; for the purpose of preservation of peace and mutual respect between two Peoples.*

WHEREAS the United States and each of them are currently composed of "citizens of the United States", as legally defined by the 14th amendment to the United States Constitution, and there has been a coup d'état in central North America resulting in the disfranchisement of the posterity of freemen who erected the states of the Organic American Union; and,

WHEREAS it is a globally recognized and accepted legal principle that a State is a society of men united together for the purpose of promoting their mutual safety, equal rights, and other advantages held in common by the joint efforts of their combined strength[2]--thereby rendering it an impossibility to form part of United States society without partaking of the same class of unnatural, legislatively-granted privileges to which U.S. persons are privy in substitute for unalienable rights; and,

---

[1] Chapter IV: Slavery, *The Social Contract*, by Jean Jacques Rousseau (pg. 6); 1762.
[2] Preliminaries: Idea and General Principles of the Law of Nations, *The Law of Nations*, by Emer de Vattel (pg. 67); 1758.

WHEREAS all civilized and legitimate government is by the consent of the governed[3], and the Members of the natural family composing Consonantia Divina have withdrawn, annulled, and disavowed the ill-conceived presumptions of such consent from the United States' federal and state governments; and though at peace with the United States, refuse to recognize the de facto U.S. governments as the de jure U.S. bodies politics under the organic Constitution for the United States of America Republic, in light of historical fact and evidence proving otherwise, as well as personal objection to the legal and moral implications involved in doing so; and,

WHEREAS being of sound mind and comprehending the Law of Nations and Nature's Law, Consonantia Divina has formed for Herself a proper and lawful Constitution under which She operates through self-governance as a sovereign and independent Nation-State[4]; providing for Her members effective legal means of exercising their natural rights through just and adequate political representation and international presence—without having to succumb to compelled association with the United States as a citizen, asylee, refugee, or other person of significantly diminished status:

WE, the People of the Nation-Family of Consonantia Divina, hereby accept and proclaim the status of "foreign government" with respect to the United States *expressly* at peace with them, as provided for in 18 U.S.C. § 11; not excepting sections 112, 878, 970, 1116, or 1201 of Title 18.

ON BEHALF OF Consonantia Divina,

*Approved July 24, 2014*

Mrs. Tamah Jada Clark
Royal Consul

---

[3] "It is a settled point with writers on the natural law, that all men inherit from nature a perfect liberty and independence, of which they cannot be deprived without their own consent." Preliminaries: Idea and General Principles of the Law of Nations, *The Law of Nations*, by Emer de Vattel (pg. 68); 1758.
[4] "Every nation that governs itself, under what form soever, without dependence on any foreign power, is a *sovereign state.*" Book I: Nations in Themselves, *The Law of Nations*, by Emer de Vattel (pg. 83); 1758.

# Consonantia Divina
## UNILATERAL TREATY OF COLUMBIA
### July 21, 2014

WHEREAS the United States and each of them are currently composed of "citizens of the United States", as legally defined by the 14th amendment to the United States Constitution in July of 1868, and there has been a coup d'état in central North America resulting in the disfranchisement of the posterity of freemen who erected the states of the Organic American Union; and,

WHEREAS the current United States acknowledges and concedes to the supremacy of the Declaration of Independence—1776, the Articles of Confederation—1777, and the natural U.S. Constitution—1787 as the Organic Law of the current United States and former United States territory, notwithstanding any U.S. state or federal statutory laws to the contrary;

THEREFORE,

In the interest of Justice, with the blessings of Columbia, resurrected and restored to Her former Glory and Infinite Grace; free from the shackles and blindfold deceitfully placed upon Her by the workers of iniquity—enemies to liberty, freedom, humanity, and the Greatest Good:

**Article I.** We, the People, of the Nation-Family of Consonantia Divina, being Natives of central North America entitled to unalienable rights recognizable under the Organic Constitution of the United States of America Republic, hereby recognize and accept:

    i.    The *ipso facto* imposition of the obligations of the Bill of Rights upon all U.S. persons, as well as their governments, in the protection from encroachment by any of them upon Our rights; and,

    ii.    The inability of U.S. courts and persons to exercise authority and /or personal jurisdiction upon Our exclusively private property and private conduct.

**Article II.** We, the People, of the Nation-Family of Consonantia Divina, composing a lawful foreign government, hereby recognize and accept the privileges and immunities of the Vienna Convention on Diplomatic Relations of April 18, 1961, as provided for in 22 U.S.C. § 254b.

ON BEHALF OF Consonantia Divina,

Approved July 24, 2014

Mrs. Tamah Jada Clark
Royal Consul

# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF GEORGIA
### (ATLANTA DIVISION)

| | |
|---|---|
| **Jason Joseph Clark,** ) <br> **Tamah Jada Clark** (both on their own ) <br> behalf and that of "Baby" Clark), ) <br> ) <br> Plaintiffs ) <br> ) <br> v. ) <br> ) <br> DANIEL J. PORTER, et al., ) <br> ) <br> Defendants | 1:14-cv-02128-WBH <br><br> **Civil Action No.**_____ |

## CERTIFICATE OF SERVICE

## FOR

<u>EMERGENCY NOTICE TO THE COURT</u>

<u>IN THE INTEREST OF JUSTICE AND THE LAWFUL PRESERVATION OF
THE DIGNITY OF THE U.S. CONSTITUTION—(REGARDING MOTIONS
AND BRIEFS/MEMORANDUMS OF DEFENDANTS REPRESENTED BY
RALEIGH W. ROLLINS AND DEBORAH NOLAN GORE)—; AND
INTEGRATED MOTION TO DENY THE AFOREMENTIONED MOTIONS
WITH INTEGRATED MEMORANDUM IN SUPPORT THEREOF; AS WELL
AS INTEGRATED MOTION FOR INJUNCTIVE RELIEF AND
MEMORANDUM IN SUPPORT THEREOF</u>

I, Mrs. Tamah Jada Clark for the UNREPRESENTED Plaintiffs, hereby affirm

that a true and correct copy of the above-mentioned **Plaintiffs' Emergency Notice**

**to the Court** and Integrated **Motions and Memorandums** (in support thereof)

have been served on Attorney Douglas Suart Morelli for defendants Gwinnett

County, Gwinnett County Police Department, Charles M. Walters, Butch Conway,

Tracy Goodbar, and Jane Doe #1 (Christa Kendrick);  Attorney Deborah Nolan

Gore (for defendants Daniel Porter, Governor Nathan Deal, Judge Thomas Davis

Jr., Attorney General Sam Olens, Secretary of State Brian Kemp, Commissioner

Brian Owens, Warden Stanley Williams, D'Anna Liber, Brian Bellamy, Georgia

Department of Corrections, and the State of Georgia); as well Attorney Raleigh W.

Rollins (for defendants Mitchell County and Camilla Police Department) at their

last known addresses (respectively):

Attorney Douglas Stuart Morelli
75 Langley Drive
Lawrencevilla GA 30046

Attorney Raleigh W. Rollins
Alexander & Vann, LLP
411 Gordon Avenue
Thomasville, GA 31792

Attorney Deborah Nolan Gore          -AND-
40 Capitol Square, SW
Atlanta, Ga 30334-1300

For the **UNREPRESENTED** Plaintiffs,

Mrs. Tamah Jada Clark
Ph: (850) 512-6642
E-mail: TamahJClark@gmail.com
6901-A N. 9th Ave # 429
Pensacola, Fla [32504]

X: _____

Signed Thursday, October 2, 2014

Pg. 2 of 2